UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FEDERAL INSURANCE COMPANY,

              Plaintiff,                        Case No. 16–cv–11390

v.                                                   Honorable Thomas L. Ludington

PENNY FAIRBOTHAM,

              Defendant.

_____/

**OPINION AND ORDER STATING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On April 18, 2016, Plaintiff Federal Insurance Company (Federal) filed a complaint against Defendant Penny Fairbotham (Mrs. Fairbotham). ECF No. 1. Federal alleged that Mrs. Fairbotham pled no contest to embezzling $174,690.00 from its subrogee, Jim Wernig, Inc.. Accordingly, Federal contended and that Mrs. Fairbotham is liable to it for her wrongful conversion of the funds. Plaintiff also asserts that it is entitled to treble damages and attorneys' fees pursuant to M.C.L. § 600.2919(a).

After Mrs. Fairbotham filed an answer on May 13, 2016 the case was referred to Magistrate Judge Patricia T. Morris for pretrial management. See ECF No. 4. On November 1, 2016, Plaintiff Federal Insurance Company filed a motion for summary judgment. ECF No. 10. Mrs. Fairbotham filed a response on November 18, 2016. ECF No. 12. After the motion was fully briefed, Judge Morris issued a report recommending that Federal's motion for summary judgment be denied. ECF No. 14.

Judge Morris found that Mrs. Fairbotham's no contest plea was not entitled to any preclusive effect under Michigan law, and thus did not resolve her civil responsibility to Federal for the embezzled funds. She further explained as follows:

> Plaintiff's provision of Fairbotham's case history from the Gaylord Police Department, her payment schedule as ordered by the state court, emails from the Otsego County Prosecutor, and a newspaper article noting that Fairbotham was arrested on charges of embezzlement likewise fail to demonstrate that she embezzled from JWI. (Doc. 10 Exs. 5, 6, 7, 8). Plaintiff has failed to carry its burden in demonstrating that Fairbotham was the tortfeasor responsible for the damages incurred by JWI, the amount of those damages, and that Plaintiff is entitled to reclaim the damages incurred by JWI.

Rep. & Rec. at 9, ECF No. 14. The Court entered an order adopting the report and recommendation on April 10, 2017. A bench trial was scheduled and was held on November 7, 2017. Mrs. Fairbotham attended. Federal called a single witness: Mr. Eugene Skiba. Pursuant to Federal Rule of Civil Procedure 52(a)(1), the following are the relevant facts.

## I.

Mrs. Fairbotham managed two businesses, the Value Corral and U–Save Auto (the businesses) operated by Plaintiff's insured, Jim Wernig, Inc. (Wernig) in the city of Gaylord, Michigan. The Value Corral was described as a "buy here/pay here" used car business primarily serving customers who are unable to obtain other financing. U–Save Auto is a car rental franchise. Both businesses were ultimately located in a common building, but were separate businesses with separate business records.

Mrs. Fairbotham's husband was purchasing and operating the Value Corral between 2003 and 2007 pursuant to a land contract sales agreement with Eugene Skiba (Mr. Skiba). Mr. Skiba is also an owner of Jim Wernig, Inc. Mrs. Fairbotham served as manager during the time she and her husband operated the businesses. Around 2008, Mr. Skiba reclaimed ownership of the Value Corral because Mr. Fairbotham fell behind on his land contract payments. Mrs. Fairbotham, however, continued to manage the Value Corral for Jim Wernig, Inc.

## A.

Initially, Mrs. Fairbotham ran the Value Corral and Mike Murphy ran the U–Save Auto. The businesses were ultimately moved into one building and then Mrs. Fairbotham ran both of them. Trial Tr. at 68:24–69:6. Between early 2011 and 2012, Kyle Skiba (Kyle), Mr. Skiba's son, and Kyle's friend Jae Stinson (Jae) began filling in for Mrs. Fairbotham. Mrs. Fairbotham worked at the businesses the majority of the time, but she did not work every other Saturday. *Id.* at 66:1–9. She also took periodic vacations and occasional weekdays off. *Id.* When she was not working, Jae would operate the businesses. When Jae did not fill in for her, Kyle would. Neither Jae nor Kyle ever worked contemporaneously with Mrs. Fairbotham.

When Mrs. Fairbotham was working, she was the only one who accessed cash and checks from customers and recorded the transactions in the computer bookkeeping software. There was only one set of log–in credentials for the computer system, which were Mrs. Fairbotham's credentials. *Id.* at 64:8–24. The other employees were authorized to use Mrs. Fairbotham's log–in credentials. *Id.* at 64:5–18. Mrs. Fairbotham trained Jae to use the bookkeeping software. With one limited exception, no employees besides Mrs. Fairbotham, Jae, Kyle, and Mike Murphy had access to cash, checks, or the computer system during the relevant time periods. *See Id.* at 67:25–66:8; 68:24–69:6.

Mrs. Fairbotham testified that Jae and Kyle were instructed to deposit the cash and checks received each day that they worked. *Id.* at 122:1–24. She further testified that each time Jae or Kyle filled in for her, cash and checks were always deposited prior to her return. *Id.* Mr. Skiba testified, on the contrary, that Jae and Kyle told him that Mrs. Fairbotham instructed them not to make deposits but to leave the cash and checks at the businesses until she returned. *Id.* at 67:1–24.

At the close of business each day, Mrs. Fairbotham prepared a summary of the day's business (hereinafter "daily reports" or "bank deposit reports") and provided a copy to Mr. Skiba's financial manager, Marilyn Willits (Ms. Willits), at the Jim Wernig Chevrolet dealership. *Id.* at 73:1–23 93:16–21; Pl.'s Tr. Br. Ex. 1 (RGL Report) at 2, ECF No. 25-2. The daily reports recorded cash and checks collected at the businesses, payments for business expenses made in cash or by check, and a receipt for the daily bank deposits made. Trial Tr. at 73:1–23 93:16–21. The daily income was entered into the bookkeeping software.

Ms. Willits was to reconcile the daily reports she received from Mrs. Fairbotham with the bank statements from First Federal Bank. Pl.'s Tr. Br. Ex. 1 (RGL Report) at 2. With one potential exception, between 2008 and 2013 neither Mr. Skiba nor Ms. Willits questioned Mrs. Fairbotham regarding the daily reports she furnished them, questioned her about the finances of the businesses, or suspected that any money was missing.

**B.**

In addition to filling in for Mrs. Fairbotham as an employee at the businesses, Jae was also a customer of U–Save. On one occasion in July of 2013, Jae reported to Mr. Skiba that he rented two vehicles over the long fourth of July Weekend. 79:4–9. He reported to Mr. Skiba that he paid somewhere between 50 and 100 dollars for each. Trial Tr. at 79:4–9. Jae informed him that he prepared and stapled the rental agreements to the outside of two envelopes, wrote a description on the envelopes, placed the cash inside the envelopes, placed the envelopes into the cash register, and later discovered that the cash was not deposited at First Federal Bank. Trial Tr. at 79:10–82:5; 97:19–102:23. Mrs. Fairbotham was not working the day Jae rented the vehicles. *Id.*

After learning about the missing money from Kyle, Mr. Skiba confronted Mrs. Fairbotham. Ms. Fairbotham was unable to locate Jae's envelopes or money, but did locate the rental agreements. *Id.* Mr. Skiba called the police. *Id.* Mrs. Fairbotham allegedly said she would write him a check for the missing money. *Id.* Sometime thereafter, Mrs. Fairbotham approached Mr. Skiba indicating she had located the envelopes and handed Mr. Skiba envelopes with cash inside. *Id.* Although the amount of money was correct, the envelopes did not match the description Jae provided, as they were plain envelopes with no writing on them.

Mr. Skiba also reported that Mrs. Fairbotham told him she found the envelopes in the "file" whereas Jae told Kyle he put them in the cash register. *Id.* Additionally, Mr. Skiba had previously noted when examining the rental agreements that the corners were ripped, as if they had been stapled to the original envelopes and then torn off. However, the envelopes produced to him by Mrs. Fairbotham had no staple marks. *Id.* Mr. Skiba examined recent deposit reports and discovered that no cash deposits had been made for roughly two months, though he was quite sure there were cash rentals made during that period of time. *Id.* Mr. Skiba then placed Mrs. Fairbotham on leave pending an internal investigation, and ultimately dismissed her. *Id.*

Mr. Skiba directed Kyle, Jae, and Ms. Willits to begin an internal investigation of the Value Corral's books. *Id.* at 83:6–85:20. He testified that they reviewed "several thousand pages" of daily reports produced by Mrs. Fairbotham each day to Ms. Willits between 2008 and 2013. *Id.* at 86:21–25. He testified that Kyle, Jae, and Ms. Willits found the original daily reports prepared by Mrs. Fairbotham, and a second set of photocopied reports prepared by Mrs. Fairbotham to conceal the missing funds. *Id.* at 72:24–76:13; 94:14–97:15.

Mr. Skiba testified that the original copies of the daily reports contained "miscellaneous paid–outs" or "pay–outs," indicating that cash intake had been paid out for various purposes such

as fuel. *Id.* at 72:24–76:13; 94:14–97:15. These miscellaneous pay–outs tended to take place between 5:50pm and 6:01pm each day. Importantly, these miscellaneous pay–outs contained no corresponding receipts documenting the use of the cash. *Id.* at 72:24–76:13; 94:14–97:15.

Mr. Skiba testified that the copies of these daily reports that Mrs. Fairbotham furnished to Ms. Willits did not match the originals located at the businesses. *Id.* at 72:24–76:13; 94:14–97:15. The supporting receipts and deposit slips were photocopied along with the deposit report so as to physically cover up the entry on the deposit report for the miscellaneous payout amount.[1] *Id.* at 72:24–76:13; 94:14–97:1.; RGL Report at 2, ECF No. 25–2. Thus, Ms. Willits could not see an entry for miscellaneous payout amounts, but only was able to read the total cash, total checks, and total deposit. *Id.* at 72:24–76:13; 94:14–97:1.; RGL Report at 2, ECF No. 25-2 .

Mr. Skiba and his employees prepared a summary of their findings for each month of the relevant period, and found a cash shortage of roughly $183,000 between 2008 and 2013. *See* Skiba Aff. at 4, ECF No. 10–10. The breakdown of loss by year was as follows: 2008: $2,827; 2009: $21,590; 2010: $31,177; 2011: $59,862; 2012: $39,340; 2013: $28,475. *Id.* The shortage represented the difference between the amount of the business's cash and check revenue as reflected in the daily reports and the bookkeeping records, and the amount deposited at the bank.

---

[1] The testimony regarding the photocopies was difficult to understand. Page two of the RGL report contains a more cogent description:

> The subject employee was allegedly executing miscellaneous pay–outs on sales transactions to cover the amount being misappropriated. As such, the bank deposit reports often matched the bank statements. When the subject employee would copy the supporting documentation, such as receipts and deposit slips, she would use it to physically cover up the detail on the bank deposit report, thus hiding the miscellaneous pay–out amounts. All that the office manager was able to read on the reports was the total cash, total checks, total other and total deposit. Therefore, the scheme went undiscovered for years.

Mr. Skiba testified that he later engaged CPA firm Miller & Cook, LLP to review the findings. Trial Tr. at 84:3–6; 85:14–16. Miller & Cook sent Mr. Skiba a letter, dated September 15, 2013, which describes their procedures and conclusions.[2] The letter provides as follows:

> We have performed procedures in the following page 1 and referenced schedules which were agreed to by you, solely to assist you in the answering your request for information. This engagement to apply agreed–upon procedures was performed in accordance with attestation standards established by the America Institute of Certified Public Accountants. *The sufficiency of the procedures is solely the responsibility of the specified users of the report. Consequently, we make no such representation regarding the sufficiency of the procedures listed in the following page 1 and referenced schedules either for the purpose for which this report has been requested or for any other purpose.* The results of our procedures are listed in the following page 1. *We were not engaged to, and did not, perform an examination, the objective of which would be the expression of an opinion on the accompanying information. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.* This report is solely for your information and use and is not intended to be and should not be used by anyone other than you. We understand you may share this report with local law enforcement and your insurance company.

(emphasis added).

Jim Wernig submitted a claim to Federal based on the internal investigation, claiming embezzled funds in an amount of roughly $183,000. Federal then engaged RGL Logistics to conduct an examination of the embezzlement claim. RGL reviewed the documents provided to them by Mr. Skiba, which included system bank deposit reports, deposit slips, and bank statements[3]. Pl.'s Tr. Br. Ex. 1 (RGL Report) at 4, ECF No. 25-2. They too compared the revenue information with the bank statements. *Id.* Specifically, RGL examined a sample size of 18 months including March and June of each year from 2008 to 2013, and February through September of 2011. *Id.* RGL prepared a report of its findings, and compared them with the loss claimed by Mr. Skiba.

---

[2] The letter was produced by Mrs. Fairbotham at trial, and was not accompanied by the document containing "the results of our procedures" referenced in the letter.
[3] The same documents that were allegedly missing supporting receipts for payouts.

RGL found a 98.53% percent correlation between Mr. Skiba's claimed loss of $65,400 for the sample months and the $64,400 loss they calculated using the records he provided to them. *Id.* at Schedule 1. Based on the correlation between these two calculations, RGL extrapolated that correlation for the entirety of the period of claimed losses. Based on this report, Federal paid out 98.53% of the claimed loss, or $179,690. *Id.*

## C.

In 2015, Mrs. Fairbotham was arrested and charged with five counts of embezzlement. Pl's Tr. Br. Ex. 6 (Criminal Case History), ECF No. 25-7. In Count I, she was charged with embezzlement of $50,000 or more but less than $100,000 (a 15 year felony). *Id.* Counts II and III charged the offense of embezzlement by an agent or trustee of $20,000 or more but less than $50,000 (10 year felonies). *Id.* Count IV charged her with the offense of embezzlement by an agent or trustee of $1,000 or more but less than $20,000 (a 5 year felony). *Id.*

Mrs. Fairbotham stated during the bench trial that the criminal case against her was dismissed during the preliminary exam because the assigned judge could not conclude that the evidence either established a loss or that Mrs. Fairbotham was responsible for the loss. Mrs. Fairbotham also stated that her opinion was that there was no loss.

In any event, the criminal case history reflects that Mrs. Fairbotham was made a plea offer. *Id.* All of the felony charges were dismissed in consideration of her entering a no contest plea to the misdemeanor offense of embezzlement by an agent or trustee of $200 or more but less than $1,000. *Id.* Mrs. Fairbotham was not required to pay restitution to Federal. She was only required to pay Jim Wernig's fidelity insurance deductible of $5,000. She served thirty days in jail. *Id.*

Federal explains that they initiated this civil case because the prosecutors failed to protect Federal's interest as victims under the state victim's rights act. Federal included the following explanation in their trial brief:

> Plaintiff's representative Ayanna Mishoe–Brooker, Esq., continually communicated with the prosecutor's office, requesting that the prosecutor protect Plaintiff's interest in the embezzled funds under the William Van Regenmotor Crime Victim's Rights Act, MCL 780.751, et seq. (See email correspondence with Terri Thomasma, Victim Advocate, Otsego County Prosecutor Office, Ex. 8). Under the Act, when sentencing a defendant who is convicted of a crime, the court shall order that the defendant make restitution to any victim of the defendant's course of conduct. (MCLA 780.766 (2). In this case, the Court only required Defendant to reimburse Wernig the $5,000.00 deductible it paid Plaintiff to receive the insurance proceeds, and ignored the remaining funds due to Plaintiff based on Defendant's embezzlement. Because Defendant was not ordered to reimburse Plaintiff for the remaining embezzled funds, Plaintiff was forced to file this lawsuit.

Pl.'s Tr. Br. at PGID 157, ECF No. 25.

### D.

Prior to trial Federal filed their Rule 26(a) disclosures reflecting their intent to call the following witnesses:

**Witnesses Plaintiff Expects to Call**
1. Penny Fairbotham (Defendant)
2. Eugene Skiba (Owner Jim Wernig, Inc.)
3. Kyle Skiba (Employee Jim Wernig, Inc.)
4. Carly Jacobson, CIA, CFE, CRMA (Manager RGL Logistics)

**Witnesses Plaintiff May Call**
1. Bryan Clemens (Record Custodian Jim Wernig, Inc.)
2. Mr. Fairbotham (Defendant's spouse)
3. Sergeant Frank Claeys, Gaylord Police Department
4. Ayanna K. Mishoe–Brooker, Esq. (Chubb representative)
5. Record custodian for 87–A District Court for the County of Otsego

Pl.'s Pretrial Discl., ECF No. 22.

### II.

Common law conversion consists of any "distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Morris v. Schnoor*, 2014 WL 2355705, at *38 (Mich. Ct. App. May 29, 2014) (citing *Foremost Ins. Co. v.*

*Allstate Ins. Co.*, 439 Mich. 378, (1992)). A statutory conversion claim is governed by MCL 600.2919a, which provides:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

## III.

### A.

Mr. Skiba was the sole witness to testify. He was a credible witness, with some noted exceptions. But his testimony alone did not establish that it was more likely than not that $183,000 was embezzled or stolen from the Value Corral or that Mrs. Fairbotham stole the funds. That is true for a number of reasons.

First, Mr. Skiba had no credible explanation for why he consolidated the duties for recording cash payments to bookkeeping records, receiving cash and checks, making cash payments, and making daily deposits to the bank. He essentially violated the most basic rules of business practice for managing cash. Equally unexplained was how six years of financial statements could be produced, if for no more reason than preparing tax information, without reconciling business records and daily deposit information. This is particularly puzzling considering the business records accurately recorded revenue, whereas the daily deposit information allegedly reflected, in many cases, materially aberrant information.

Second, it was also apparent from his testimony that Mr. Skiba had little personal knowledge of either the events leading to the accusation that Mrs. Fairbotham was embezzling funds or the actual investigation that followed. That is, for the most part he was reporting

information that he allegedly learned from Jae, his son Kyle, or from Ms. Willits. When asked who was responsible for compiling the information contained in the summary of loss attached to his affidavit, Mr. Skiba answered: "*Kyle and Marilyn did the majority of the accounting* from bank deposits, and the bank recs to the end of day business. *Kyle and Marilyn did predominantly 99 percent of that*, while Jae continued to accept payments and rent cars in the value corral and U–Save." *Id.* at 104:14–18 (emphasis added). The only three witnesses who had personal knowledge of investigating the source documents did not appear at trial or otherwise testify. This was a material omission from Federal's proofs.

Third, the absence of Jae and Kyle was noteworthy for two very important reasons. First, they too had access to the bookkeeping program on the computer, cash, and deposits before the loss was reported. Second, and perhaps more importantly, they had access to the source documents that were reviewed during the investigation, including the receipts for payouts. Similarly, Ms. Willits who was responsible for reviewing the daily reports for years with the "pay-out" figure obscured also had access to the business source documents during the investigation. None of these parties were produced to explain the accuracy of their efforts, to address their inability to be independent investigators, or the results of their efforts.

Fourth, none of the source documents relied on during the investigation were offered into evidence and in fact were not even available during the trial. Not a single original daily cash report. Not a single corresponding photocopied daily cash report with the "pay-out" obscured. None.

Fifth, Mr. Skiba's testimony concerning Mrs. Fairbotham's method of deception was inconsistent with the explanation furnished in his affidavit. Paragraph 6 of his affidavit provides: "I began an investigation, and discovered that cash for rentals were not being deposited. Mrs.

Fairbotham would take cash from customers for rentals and not deposit the funds *or record the transactions*." Skiba Aff. (ECF No. 10-10). Mr. Skiba testified, however, that Mrs. Fairbotham did accurately record all money collected from customers. 94:1–8. Mr. Skiba never intimated that he called into question the accuracy of the totals for cash collected at either business.

Finally, Mr. Skiba offers three different accounts of his confrontation with the Defendant regarding the money missing from the rentals. First, Mr. Skiba testified that, after Kyle informed him of the missing money, Mr. Skiba confronted Mrs. Fairbotham who handed him rental agreements without any envelopes or cash. *Id.* at 79:10–19. He then went over to "the other building," discussed the matter with Jae, noted that the rental agreements matched Jae's description, then called the Gaylord Police. *Id.* at 79:20–80:6.

> So I called the Gaylord City Police Department, I talked to a sergeant. He told me to go over and ask her, and the police department said, the sergeant said to me, she's gonna offer to pay you for the shortage. And I said, okay, whatever. He said, take the check. So when I went back over to get the rest of the cash rental agreements, Mrs. Fairbotham was shredding paperwork
> Q: Do you know what the paperwork was?
> A: I took all of the shredding, put it in a garbage bag, and I locked it up and I grabbed it and I said, I need to have a conversation with you over at my office, if you'd please come over, and Marilyn Willits, my office manager, and I had a conversation with her.
> Q: Okay what was the conversation?

*Id.* at 80:8–21.

Mr. Skiba then stopped to correct himself and started over: Mr. Skiba's second explanation added new and confusing details:

> A: That conversation was where's the shortage. *Excuse me, excuse me, let me back up, let me back up. Before I had the conversation, before — after I called the police, after I had the rental slips*, Mrs. Fairbotham came running over to the main building with two white envelopes, and she said, I found the money. I said, okay. And in there was the right amount of cash, but no staple holes on the envelopes and no amounts on the envelopes. *So I took them, and then — I'll go back. I called the police and then I had said — I went back over, she was shredding paperwork, I grabbed the shredding paperwork, took the rental. I went*

–12–

> *back over and I said, we need to have conversation.* So Marilyn Willits, myself and I, and I basically took a form, employee form, and I said, I'm going to have to put you on leave of absence, and do you have any idea where these funds are. No. *She said, I don't know where they are. I'm responsible, but I don't know where they are.* There's no cash — we also took the cash rental receipts when I was there the first time, and I had my office total it up. It was about $2,800 that I could find. There were $2,800 worth of cash rentals that I could not find deposits for. *And exactly like the city police said, I – when I confronted Mrs. Fairbotham, I said, I'll put you on leave of absence. She wrote on there, I will be responsible for all missing funds, signed it and dated it.* And I said, well, I'll have to put you on leave of absence. *And she said, well, I'll pay for it. I'll write the check.* And then I said, how long — and then she asked me, how long am I going to be on leave of absence? I said, I don't know. We're going to have to do an audit. Well, she said, I can't pay you, if I'm not working. I said, well — so I turned the leave of absence sheet around, she signed it, dated it; I signed it, dated it, and we went over and locked – changed keys, and she left that day.

*Id.* at 80:22–82:5 (emphasis added). A third distinct explanation of events was offered by Mr. Skiba's affidavit:

> Stinson informed Kyle that he had paid for his rental in cash. When *Kyle approached Defendant* about the cash deposits, asking for the envelopes Stinson had put the cash in, *Defendant produced the envelopes that did not match the description of those Stinson had used. This discrepancy raised suspicion with Kyle*, who informed me and we began an investigation into potential cash shortages . . . *I then reviewed the financial records* from Value Corral and discovered that there was tens of thousands of miscellaneous payouts with no receipts to support the transactions. It was evident that Defendant had been embezzling from both companies. *I confronted Defendant, who stated that she would write a check for the missing funds* . . . I reported the embezzlement to the Gaylord Police Department

Skiba Aff. at ¶ 5–10.

Mr. Skiba's testimony was inconsistent in a number of respects. Mr. Skiba testified that the non–matching envelopes were produced during his conversation with Mrs. Fairbotham, not during Mrs. Fairbotham's conversation with Kyle. *Id.* Mr. Skiba testified that *he* determined the envelopes were suspicious, not Kyle. Mr. Skiba's testimony suggests that all relevant events took place during one conversation with Mrs. Fairbotham: he confronted her, she produced rental agreements but no envelopes or cash, he called the police, she offered to write a check for the

–13–

missing money, the police left, she then produced non–matching envelopes with cash inside, he placed her on leave. Trial. Tr. at 79:10–82:5. The affidavit on the other hand suggests that many of these events took place at different times during different conversations with different people.

Mr. Skiba testified that he caught Mrs. Fairbotham shredding documents after he called the police. *Id.* at 81:6–7. He did not elaborate on this, and that allegation is noticeably absent from his affidavit. He also testified that Mrs. Fairbotham acknowledged responsibility for the missing money several times. That information is also noticeably absent from his affidavit. He testified she acknowledged responsibility verbally to the Gaylord Police Officer, to Mr. Skiba, and to Ms. Willets. *Id.* at 80:8–13; 81:13. She also acknowledged responsibility in writing on her leave of absence form which she signed and dated. *Id.* at 81:20–21. Notably, Federal did not produce the leave of absence form which allegedly contained her admission of guilt and her signature. Ms. Willits did not testify nor did Gaylord Police Sergeant Frank Claeys, though he is listed in Federal's Pre–Trial Disclosures. Pl's. Pretrial, Discl., ECF No. 22.

In short, the evidence presented did not support or corroborate Federals allegations.

**B.**

Federal also relies on the RGL forensic report to establish Defendant's liability. Federal's trial brief provides: "RGL conducted an investigation, and produced a report on February 5, 2015, finding that based on their analysis of the records Eugene Skiba provided, as well as other financial documents, Defendant Fairbotham had embezzled $179,690 from Jim Wernig, Inc. during the time period of March 2008 through June 2013." Tr. Br. at 8. However, this mischaracterizes the RGL report. First, the RGL report does not conclude that Mrs. Fairbotham embezzled money. Rather, it states "*we understand* that in July 2013, *the Insured discovered that its former employee*, Penny Fairbotham . . . misappropriated cash." RGL Report at 1 (emphasis

added). Thus, the report does not identify Ms. Fairbotham as the misappropriator, but merely repeats the allegation of Federal's insured.

The background summary in the report contains similar language carefully distancing RGL from any conclusions about Ms. Fairbotham, and underscoring the extent to which RGL relied on the insured's representations: "*Based on the summaries provided by insured* it appears that the subject employee began misappropriating cash in 2008 . . . *Per the insured*, in 2011, deposits were not made on a daily basis . . . *We understand* the subject employee would place the report in the office manager's mailbox . . . *we understand* that she offered to write a check for the missing funds . . . [t]he subject employee was *allegedly executing miscellaneous payouts* on sales transactions to cover the amount being misappropriated." *Id.* at 1–4. Thus, the RGL report does not purport to identify Mrs. Fairbotham, or anyone else, as the thief.

The data tables set forth in schedule one and schedule two of the report also do not corroborate that Mrs. Fairbotham was the misappropriator. Federal identified Carly Jacobson, manager at RGL logistics, as a witness expected to testify at trial. Pl.'s Pretrial Discl. However, Federal did not produce Ms. Jacobson or even an affidavit. Thus, the only context provided for the findings of the RGL report is provided in the background summary of the report. According to the summary, RGL relied upon the source documentation produced by the insured, namely "bank deposit reports, deposit slips, bank statements, and receipts." *Id.* at 4. RGL also essentially repeated the same procedure as Kyle and Ms. Willits did in the in–house investigation:

> For each day, we scheduled the detail of the cash collected along with the net miscellaneous pay–outs . . . We then scheduled the amount of cash and checks clearing the bank per the bank statement. Next we calculated the difference between the bank statement and system deposit reports and compared that to the insured's claim.

*Id.* Thus, RGL's "forensic audit" involved little more than double checking the source documents produced by the insured, noting the absence of some documents, and verifying the

–15–

arithmetic. Furthermore, they did not analyze data for the entire period of the alleged embezzlement, but merely spot checked a sample of 18 out of 67 months.

> Based on our review and analysis of a sample of the available documentation provided, we calculated misappropriated cash funds totaling $64,440 for the period of January 2008 through July 2013. The total amount claimed during this time was $65,400. Our calculated amount is 98.53% of the claimed amount. When extrapolated over the entire claimed amount of $182,371, our calculated amount would be $179,690. Please note that this is before any deductible or policy limitation. We defer to your judgment as to the applicable coverage and limits.

*Id.* at 5.

Thus, the RGL report at best establishes $64,440 of money unaccounted for during the period of time Mrs. Fairbotham was the primary employee of the businesses.[4] Federal found this sufficient to payout the claim of nearly $180,000. No independent analysis was done with respect to the other 49 relevant months accounting for $115,000 of the loss. Federal accepted the insured's rendition of the claimed loss for those 49 months without analyzing the records for that time period.

---

[4] $47,426 was unaccounted for during the period between February 2011 and September 2011. Notably, that period of time does not corroborate the alleged method of defalcation imputed to Defendant, namely the use of false "miscellaneous payouts". Mr. Skiba testified that for each dollar of loss, there was *always* an offsetting entry for a miscellaneous payout. Trial Tr. at 108:2–4. Schedule 2 of the RGL report, however, reveals only $50 in miscellaneous payouts for the entire eight month period of time between February and September 2011. Additionally, a review of the sample months between March 2008 and June 2010 reveals $8,494 of loss, but only one miscellaneous payout unsupported by a receipt in an amount of $60 on March 23, 2009. The unusual "note A" in the RGL report also fails to account for the missing money. For many days during the sample period, schedule 2 of the report has a notation under "comments" labeled "note A" in instances where there was a miscellaneous payout and for some reason RGL simply "assumed there was a supporting receipt although not provided." RGL Report at Sch. 2 pg. 7. Even assuming "note A" is consistent with Mr. Skiba's explanation, the total amount of loss for all days marked "note A" does not even approximate the $64,440 loss during the sample months.

Mr. Skiba testified as to what he believe the RGL report showed, and chose one date as an example: March 6, 2009. Mr. Skiba was asked why the $500 shortage for that day was not accounted for under "miscellaneous payouts" in the RGL Report. That is, why did March 6, like so many other days, not comport with his miscellaneous payout explanation? He answered "So – so I'm assuming, and I don't have – I had don't have – you know, we'd have to have that end of day [deposit report] for that – to look at it." Trial Tr. at 107:12–20. In other words, in order to corroborate his explanation for the $500 loss on March 6, Mr. Skiba said he would need to refer to the source documentation, namely the daily deposit report. Without that source documentation, he was unable to make sense of the RGL report.

Furthermore, for the 18 sample months they did review, RGL simply scheduled a loss of $64,440. RGL did not purport to identify a responsible party. The individual(s) at RGL responsible for the report did not testify as to its contents and their methodologies. The loss was calculated with reference to records produced by the insured, records that were not produced during the bench trial.

**IV.**

For the foregoing reasons, the evidence presented in this case was insufficient to establish by a preponderance of evidence that any amount of money was converted at the subject businesses, much less that Mrs. Fairbotham was the responsible tortfeasor.

Accordingly, it is **ORDERED** that Judgment is entered in favor of Defendant Penny Fairbotham and against Plaintiff Federal Insurance Company.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: December 12, 2017

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 12, 2017.

s/Kelly Winslow  
KELLY WINSLOW, Case Manager